**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

|  |  |
|---|---|
| MIKE ANDRUS,<br><br>          Plaintiff,<br><br>     v.<br><br>HURRICANE CITY et al.,<br><br>          Defendants. | Case No. 2:04-CV-1001 DAK<br><br>**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTIONS FOR JOINDER AND SUMMARY JUDGMENT** |

Plaintiff, Mike Andrus, filed this *pro se* civil rights suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2007). This case is now before the Court on Defendants' motions for summary judgment and Plaintiff's motions for joinder and summary judgment.

### ANALYSIS

### I. Plaintiff's Claims

Plaintiff's Amended Complaint includes eighteen separate causes of action under both federal and state law.  Plaintiff describes each of his claims as follows:  Claim One is for "false arrest;" Claim Two for "false imprisonment;" Claim Three for "unreasonable search and seizure;" Claim Four for "infliction of cruel and unusual punishment;" Claim Five for "denial of right to due process and equal protection;" Claim Six for "prosecution

without jurisdiction;" Claim Seven for "denial of a fair trial;" Claim Eight for "denial of right to assistance of counsel;" Claim Nine for "denial of right to free speech and free exercise of religion;" Claim Ten for "denial of right against self-incrimination;" Claim Eleven for "conspiracy to deprive civil rights;" Claim Twelve for "negligence, failure to act;" Claim Thirteen for "being placed twice in jeopardy;" Claim Fourteen for "negligent hiring, negligent retention, negligent supervision and negligent training;" Claim Fifteen for "malicious prosecution;" Claim Sixteen for "intentional infliction of emotional distress;" Claim Seventeen is for costs and attorney fees under 42 U.S.C. 1988; and Claim Eighteen is for punitive damages.  Plaintiff seeks a range of declaratory and injunctive relief, compensatory damages and punitive damages.

## II. Factual Record

Plaintiff's claims stem from an incident that occurred at the Hurricane City Justice Court on November 5, 2003.  Plaintiff went to the Justice Court to inquire about the status of a Petition for Permission to Appeal from an Interlocutory Order he had previously filed concerning a traffic citation issued to his wife.  Plaintiff wanted to find out why the petition had not been forwarded to the Fifth District Court for the State of Utah. Plaintiff went to the public counter in the clerk's office, which is immediately adjacent to Judge Carr's chambers, and spoke to

the court clerk Defendant Pectol.  Pectol told Plaintiff that she would get the judge to speak with Plaintiff, to which Plaintiff replied that his business was with the clerk and that he did not want to talk to the judge.

Overhearing this conversation, Carr approached the counter and asked Plaintiff what he wanted.  Plaintiff again reiterated that his business was with the clerk and he did not want to speak to Carr.  Carr replied that he was in charge of the court and that Plaintiff would have to speak to him.  Plaintiff then told Carr that the clerk was refusing to forward the petition Plaintiff had filed.  Carr told Plaintiff that the court was under no obligation to send the documents.[1]  According to Carr, Plaintiff "became very argumentative and loud at this time."[2] (Carr Aff. at 10.)  Carr states that he told Plaintiff "he was out of line and to knock it off."[3]  Plaintiff again began to question Carr regarding the handling of the petition, to which

---

[1] According to Plaintiff, Carr actually said that "he," as opposed to "the court," did not have to do anything with the appeal.  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

[2] Plaintiff disputes this characterization but admits that "both Mr. Carr and myself spoke more rapidly and in earnest as the short conversation quickly proved to be unproductive for either of us."  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

[3] Plaintiff denies that Carr ever made any statement to this effect.  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

Carr responded that the discussion was over.[4]  When Plaintiff continued speaking, Carr stated "this was [his] court and [Plaintiff] was to discontinue his behavior."[5]  Plaintiff then moved into the hallway and asked whether that was also part of Carr's court.  Carr states that he then told Pectol to call the police, at which point Plaintiff "thumbed his nose" at Carr and turned to exit the building.[6]

Carr followed Plaintiff into the hallway and told Plaintiff that he was in contempt of court and was not to leave.  When Plaintiff continued to exit the building Carr followed him into the parking lot and repeated his order for Plaintiff to stop but Plaintiff did not comply.  Carr then stated that he was placing Plaintiff under arrest for disorderly conduct and contempt of court, he also stated that he had police powers and was exercising them.[7]  Plaintiff got into his truck and began to back

---

[4] According to Plaintiff, the exact words used by Carr were "I don't have to talk to you."  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

[5] Plaintiff denies that Carr warned him to discontinue his behavior.  Instead, Plaintiff states that Carr told him to leave or he would have Plaintiff arrested for contempt of court.  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

[6] Plaintiff denies hearing Carr tell the clerk to call the police, however, Plaintiff states that "I expressed my displeasure with [Carr] by thumbing my nose at [him]."  (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 18.)

[7] Plaintiff states that he was already in his truck when Carr made these statements.  (Pl.'s Mem. Opp'n City Defs.' Mot.

out of the parking stall when he noticed Carr behind him.
Plaintiff then stopped and exited his vehicle, approached Carr,
raised his arm to the square and said, "I rebuke you in the name
of Jesus Christ and tell you to cease your usurpations lest you
be destroyed in the flesh." (Pl.'s Mot. Summ. J. Ex. C at 2.)
Plaintiff then got back into his vehicle and drove out of the
parking lot.

Defendant Buell, an officer with Hurricane City Police
Department, responded immediately to the justice court. Carr
explained to Buell what had occurred and directed that Plaintiff
be arrested and brought back to the court. Buell immediately
contacted the dispatcher with a description of Plaintiff's
vehicle and his likely direction of travel. Within minutes
Officers Feltner and Lockwood came upon Plaintiff's vehicle
heading away from town and initiated a traffic stop. Plaintiff
exited his vehicle and began speaking with the officers.
Plaintiff asked whether the officers were conducting an
"investigation of some sort" and stated that he needed to talk to
an attorney. (Pl.'s Mot. Summ. J. Ex. B.) Feltner then told
Plaintiff to turn around and place his hands behind his back.
Plaintiff responded by asking whether he was being placed under
arrest and Felter stated that Plaintiff was merely being detained

Summ. J. at 19.)

while the officers figured out what was going on.  When Plaintiff objected to being handcuffed if he was not under arrest Feltner told him that if he refused to talk to the officers he would be arrested.  Plaintiff reiterated his desire to speak to an attorney and was placed under arrest.  Plaintiff was then transported back to the Hurricane City Justice Court.

After arriving at the court Plaintiff was brought before Judge Carr in his courtroom.  Carr explained his contempt powers and stated that Plaintiff's earlier behavior in the clerk's office was very disruptive.  Carr pointed out that Plaintiff was disrespectful toward him, had thumbed his nose at Carr, and had disobeyed Carr's order not to leave.[8]  Carr gave Plaintiff an opportunity to explain his actions but Plaintiff refused to speak.  Carr then asked the city prosecutor, Defendant Edwards, to try talking with Plaintiff while Carr went back to his chambers.  After a short time Edwards came to Carr's chambers and reported that Plaintiff was still refusing to speak and "wanted to go to jail."  (Carr Aff. ¶ 26.)  Carr returned to the bench and again invited Plaintiff to explain his actions but Plaintiff refused.  Carr then stated that he was summarily punishing

_____

[8] According to his affidavit, Carr also stated his belief that Plaintiff's conduct had been disorderly.  Plaintiff, however, denies any mention of disorderly conduct during the contempt proceedings and states that he was surprised when he later received a summons on the disorderly conduct charge. (Pl.'s Mem. Opp'n City Defs.' Mot. Summ. J. at 19.)

Plaintiff for contempt and imposing a sentence of five days jail confinement.  Carr prepared a commitment order and Defendant Morris transported Plaintiff to the Washington County Jail where he served out the sentence.  Plaintiff alleges that jail officials failed to provide adequate medical care for Plaintiff during his incarceration.

On November 13, 2003, Edwards filed a criminal Information charging Plaintiff with disorderly conduct.  The charge was based on the same conduct which led to the contempt conviction.  On November 26, 2003, Plaintiff received a summons signed by Carr and a copy of the Information.  Carr later recused himself from the disorderly conduct case which was eventually dismissed on Edwards' recommendation.

### III. Summary Judgment Analysis

### A. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. civ. P. 56(c). The moving party bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." Cellotex v. Catrett, 477 U.S. 317, 325 (1986).  This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. Johnson v. City of Bountiful, 996

F. Supp 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Federal Rule of Civil Procedure 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, 144 F.3d 664, 671 (10th Cir. 1998).* The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling, 968 F.2d 1022, 1024 (10th Cir. 1992).* Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).*

## B. Defendant Carr: Judicial Immunity

Carr moves for summary judgment on each of the claims against him based on judicial immunity. Under Tenth Circuit precedent "[j]udges are absolutely immune from civil liability for judicial acts, unless committed in the clear absence of all

jurisdiction." *Henriksen v. Bently*, 644 F.2d 852, 855 (10th Cir. 1981). "[T]he necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him." *Stump v. Sparkman*, 435 U.S. 349, 98 S. Ct. 1099 (1978). The scope of the judge's subject-matter jurisdiction must be broadly construed where judicial immunity is at issue. *Id.* A judicial act is not taken in the clear absence of all jurisdiction merely because it was "in error, was done maliciously, or was in excess of [the judge's] authority." *Id. at 357*. Finally, "the Civil Rights Act does not impair the traditional common law immunity of judges from personal liability in damages for their official acts in matters within their jurisdiction." *Kostal v. Stoner*, 292 F.2d 492, 493 (10th Cir. 1961).

### i. Judicial Act

The first step in evaluating Carr's assertion of immunity is to determine whether his interaction with Plaintiff and his contempt finding qualify as judicial acts. As explained in *Stump*, "the factors in determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i. e., whether it is a function normally performed by a judge, and to the expectations of the parties, i. e., whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362.

The purpose of Carr's interaction with Plaintiff in the clerk's office was to address Plaintiff's concerns regarding the status of his court filings and his dissatisfaction with the court's handling of the matter.  As a justice court judge Carr was responsible for supervising the actions of the court clerk.  Thus, Carr's intervention in the circumstances here was clearly a normal function performed in his role as a justice court judge.

Regarding the contempt holding itself numerous circuit courts have ruled that contempt orders are judicial acts subject to absolute immunity.  *See*, e.g., Figueroa v. Blackburn, 208 F.3d 435, 443 (3d Cir. 2000) (determining "[t]here can be little doubt that holding an individual in contempt is an act normally performed by a judge"); Crooks v. Maynard, 913 F.2d 699, 700 (9th Cir. 1990) (concluding a judge's contempt order, even against a non-litigant, is clearly a judicial act); Adams v. McIlhany, 764 F.2d 294, 297 (5th Cir. 1985) (stating "[t]here is no question" the judge's acts, including contempt sentence, are "judicial acts"); Patten v. Glaser, 771 F.2d 1178, 1179 (8th Cir. 1985) (per curiam ) (affirming decision that judge who issued contempt sentence performed function normally performed by a judge acting in his judicial capacity and therefore, it constituted a judicial act); Dean v. Shirer, 547 F.2d 227, 230 (4th Cir. 1976) (determining judge who imposed a contempt sanction performed a judicial act).

The expectations of the parties also confirm the judicial nature of Carr's interaction with Plaintiff.  Carr's statement to Plaintiff that they were in his court clearly shows that Carr viewed the interaction as being judicial in nature.  Moreover, from an objective standpoint it would have been apparent that discussion of official business with a judge in the clerk's office of the courthouse could be construed as a judicial proceeding subject to the judge's contempt powers.  Finally, the fact that Plaintiff preferred to speak only with the court clerk rather than Carr indicates that Plaintiff was subjectively aware that Carr's involvement significantly altered the nature of the proceeding.

Plaintiff argues that Carr's contempt holding was not a judicial act because it was motivated by "the personal pique of an angry judge."  (Pl.'s Mot. Summ. J. ¶ 11.)  The Tenth Circuit recently rejected a similar argument in an unpublished opinion in *Giron v. Chaparro*, No. 05-2015, 167 F. App'x. 716, 2006 WL 165015, (10th Cir. Jan. 24, 2006) (unpublished).[9]  There, a court interpreter brought a § 1983 action against a state magistrate judge alleging that the judge violated the plaintiff's First, Fourth, and Fourteenth Amendment rights by holding her in

_____

[9] Although *Giron*, as an unpublished opinion, is not controlling precedent under CTA10 Rule 32.1, given the similar facts and nearly identical arguments presented the Court finds its reasoning highly persuasive here.

contempt.   The defendant-judge moved to dismiss the suit based on judicial immunity and the plaintiff argued that the judge was not entitled to immunity because:

> (1) [The judge's] action was not a judicial act, but 'an offensive weapon to vindicate personal objectives'; (2) part of the event occurred outside the courtroom in the clerk's office; (3) no formal proceeding was in progress in the courtroom, but rather it involved an informal administrative-type matter over which the judge presided in open court; (4) [the plaintiff] was not a litigant before the judge; and (5) the judge procedurally erred by failing to hold a hearing to show cause prior to issuing the contempt order and sentence.

*Id.* at 3.   In rejecting Giron's argument regarding the judge's improper motive the court stated, "[w]hile a judge's vindictive motives in issuing a contempt order cannot be condoned, a judge's act with respect to the issuance of a contempt order nevertheless patently involves a judicial function which must be afforded the defense of absolute immunity."   *Id.* at 720.   The same reasoning applies here.

Thus, the Court concludes that Carr's interaction with Plaintiff in the clerk's office and the contempt holding itself were judicial acts.

### ii. Clear Absence of All Jurisdiction

Turning to the second part of the immunity analysis the Court must determine whether Carr acted in the clear absence of all jurisdiction by holding Plaintiff in contempt.   Under Utah Code § 78-7-5 "[e]very [Utah] court has authority to: (1)

preserve and enforce order in its immediate presence . . . ."
*See* Utah Code Ann. § 78-7-5 (West 2007). Utah Code § 78-32-3
states that all Utah judges have authority to summarily punish
"contempt committed in the immediate view and presence of the
court, or judge at chambers, . . . ." *See* Utah Code Ann. § 78-
32-3 (West 2007). Section 78-31-1 defines contempt to include,
among other things, "(1) [d]isorderly, contemptuous or insolent
behavior toward the judge while holding the court, tending to
interrupt the due course of a trial or other judicial
proceeding." *See* Utah Code Ann. § 78-31-1 (West 2007). And,
Utah Code § 78-32-10 gives justice court judges authority to
"punish for contempt by a fine not to exceed $500 or by
incarceration for five days or both." *See* Utah Code Ann. § 78-
32-10 (West 2007).

Plaintiff argues that Carr acted without jurisdiction in
this instance because the cited contemptuous acts occurred
outside the courtroom while Carr was not holding court and
because Plaintiff was not a party to any case before Judge Carr.
These arguments were squarely rejected in *Giron* where the Tenth
Circuit found that:

> The informality of the proceeding did not change the
> judicial nature of the act itself, and because the judge
> generally possessed jurisdiction to impose contempt
> sanctions for disorderly conduct or disobedience of her
> orders directed to individuals before her in her judicial
> capacity, her action was not taken 'in complete absence
> of all jurisdiction.

*Giron*, 167 F. App'x. at 721.  Although *Giron* relied on New Mexico law its reasoning is equally applicable here.  Neither the informality of the proceeding in this case nor its location significantly altered its essentially judicial nature.  Moreover, Plaintiff's act of thumbing his nose at Carr during this proceeding was clearly "insolent behavior" within the meaning of Utah's contempt statute.  *See* Utah Code Ann. § 78-31-1 (West 2007).

Plaintiff argues that Carr lacked authority to make a contempt finding in the clerk's office based on Utah Code § 78-7-16, which states: "A judge may exercise out of court all the powers expressly conferred upon a judge as contradistinguished from the court."  *See* Utah Code § 78-7-16 (West 2007).  This argument is flawed for two reasons.  First, it mistakenly assumes that the contempt power is conferred on "the court" rather than the judge.  Utah Code § 78-7-18 expressly confers upon "judicial officers," as opposed to the court, authority to "punish for contempt in the cases provided by law."  *See* Utah Code § 78-7-18 (West 2007).  Second, this argument assumes that the phrase "out of court" refers to the physical location of the courtroom, not whether judicial proceedings are underway.  The fact that Utah's contempt statutes explicitly provide for direct contempt findings "at chambers," s*ee* Utah Code Ann. § 78-32-3 (West 2007), clearly

undermines Plaintiff's argument that the phrase "out of court" in § 78-7-16 limits a judge's contempt powers to the confines of the courtroom.

Plaintiff also relies on *Robinson v. City Court for City of Ogden*, 112 Utah 36, 185 P.2d 256 (Utah 1947), as support for his contention that Carr lacked contempt authority in the clerk's office.  *Robinson* struck down a direct contempt holding resulting from comments made in an elevator one-half hour after the judge had recessed court and was preparing to exit the courthouse.  As the *Robinson* court explained:

> In some instances it is difficult to determine when a judge is 'at chambers,' but this phrase can only reach far enough to protect him when he is still clothed with the official duties of his office.  The phrase cannot be extended to cover his activities when his status has reverted back to that of a private citizen.

*Robinson*, 112 Utah at 39.  Thus, *Robinson* turned on whether the judge was performing "the official duties of his office" at the time in question, not on the location where the events occurred. The conclusion that direct contempt was improper in *Robinson* was based on the fact that the judge was acting as a private citizen at the time and "was not in the performance of his official duties as a judge of the court."  *Id.* at 41.  Unlike the defendant in *Robinson*, however, Carr was performing his official duties when he found Plaintiff in contempt.

Plaintiff also argues that "matters conducted in the clerk's

office cannot be judicial," and therefore within the scope of judicial immunity, because Utah Code § 78-5-108(1), requires that "[a] justice court judge . . . conduct all official court business in a courtroom or office located in a public facility which is conducive and appropriate to the administration of justice."  (Pl.'s Mot. Summ. J. at 9.)  *See* Utah Code Ann. § 78-5-108(1) (West 2007).  Rather than invalidating Carr's actions, however, this statute appears to support Carr's immunity for judicial actions taken in the clerk's office.  As required by the statute, the Hurricane City Justice Court clerk's office is undoubtedly an "office" in a "public facility" specifically intended for the "administration of justice."

Finally, even under Plaintiff's unjustifiably cramped interpretation of Utah's contempt statutes Carr did not act in the clear absence of all jurisdiction.  Although Plaintiff's narrow reading might support a finding that Carr acted in excess of his jurisdiction, merely exceeding one's jurisdiction is not enough to deprive a judge of immunity for judicial acts.  *Stump, 435 U.S. at 357*.

In sum, the Court concludes that Carr's interaction with Plaintiff was a "judicial proceeding" within the meaning of Utah's contempt statutes, s*ee* Utah Code Ann. § 78-31-1 (West 2007); Carr's contempt holding was a judicial act; and, Carr did not act in the clear absence of all jurisdiction.  Thus, Carr is

entitled to absolute judicial immunity from Plaintiff's claims.

  **C. Defendants Pectol, Morris and Buell: Quasi-Judicial Immunity**

        Defendants Pectol, Morris and Buell move for summary

judgment on the basis of quasi-judicial immunity.  Under the

doctrine of quasi-judicial immunity "an official charged with the

duty of executing a facially valid court order enjoys absolute

immunity from liability for damages in a suit challenging conduct

prescribed by that order." *Valdez v. City and County of Denver,*

*78 F.2d 1285, 1286 (10th Cir. 1989)*.  The rationale behind quasi-

judicial immunity is that the public interest in enforcement of

court orders far outweighs any benefit to be gained by allowing

suits against court officials charged with their execution.

Without absolute immunity court officials charged with

enforcement of judicial orders would have to choose between

disregarding the judge's orders and facing discharge, or even

criminal contempt, or fulfilling their duty and being haled into

court.  *Id. at 1289*.  The Tenth Circuit has held that "[t]o force

officials performing ministerial acts intimately related to the

judicial process to answer in court every time a litigant

believes the judge acted improperly is unacceptable." *Id.*

        Plaintiff's allegations against Pectol, Morris and Buell are

based exclusively on ministerial actions intimately related to

the judicial process.  Plaintiff's allegations against Pectol

stem from her performance of official duties as the court clerk.

Similarly, the primary allegation regarding Buell is that he served as bailiff at the contempt proceeding and later wrote a police report regarding his involvement in Plaintiff's arrest. And, the only allegation against Morris is that he transported Plaintiff to jail pursuant to the commitment order of Judge Carr and booked Plaintiff into jail.

Plaintiff's Amended Complaint also generally alleges that "Pectol, Morris, Buell and unascertained Does were present at the unlawful contempt hearing and did not act to prevent the violations of Plaintiff' [sic] civil and constitutional rights and the unlawful incarceration of Plaintiff."  (Am. Compl. at 48.)  In essence, this argument asserts that defendants should have independently evaluated the legality of Carr's actions before carrying out his orders.  As the Tenth Circuit has recognized, however, such a requirement would have the unacceptable result of turning court officials into "pseudo-appellate courts scrutinizing the orders of judges."  *Id. at 1289*.

Because Plaintiff's allegations against Pectol, Morris and Buell stem exclusively from ministerial acts intimately related to the judicial process the Court concludes these defendants are absolutely immune from Plaintiff's claims based on quasi-judicial immunity.

### D. Defendants Feltner and Lockwood

Plaintiff alleges that Feltner and Lockwood violated Plaintiff's Fourth Amendment rights by arresting Plaintiff outside their jurisdiction and without a warrant.  Plaintiff also alleges that Feltner and Lockwood violated the Sixth Amendment by threatening to arrest Plaintiff unless he spoke to them without counsel present.

Feltner and Lockwood assert that they are entitled to quasi-judicial immunity "because all their actions were done pursuant to specific orders of Judge Carr."  (Defs.' Mem. Supp. Mot. Sump. J. at 4.)  As previously discussed, quasi-judicial immunity protects officials charged with executing facially valid court orders from damages suits challenging conduct prescribed by such orders.  Quasi-judicial immunity, however, does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its execution.  *See* *Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990).  Because Plaintiff's claims against Feltner and Lockwood are based not on the fact of the arrest but on the manner in which it was carried out the Court finds that these claims are not barred by quasi-judicial immunity.

### i. Pursuit Outside of Jurisdiction

The Court now turns to Plaintiff's jurisdictional argument. Plaintiff argues that his arrest by Feltner and Lockwood was

unlawful, despite being ordered by Judge Carr, because it was made outside Hurricane City limits and without a warrant. Generally, a police officer's authority does not extend beyond his jurisdiction. *Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990). "A warrantless arrest executed outside of the arresting officers jurisdiction is analogous to a warrantless arrest without probable cause." *See* Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985). And, absent exigent circumstances, such an arrest is presumptively unreasonable. *Michigan v. Summers*, 452 U.S. 692, 700, 101 S. Ct. 2587, 2593 (1981).

One well-established category of exigency is when an officer is found to be in hot pursuit of a suspect. *See Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091 (1984) (citing *United States v. Santana*, 427 U.S. 38, 42-43, 96 S. Ct. 2406 (1976)). Utah Code § 77-9-3 allows peace officers to exercise their authority beyond the limits of their normal jurisdiction "when in fresh pursuit of an offender for the purpose of arresting and holding that person in custody or returning the suspect to the jurisdiction where the offense was committed." Utah Code Ann. § 77-9-3 (West 2007). The Supreme Court has held that hot pursuit occurs when an officer is in "immediate or continuous pursuit" of a suspect from the scene of a crime. *Welsh*, 466 U.S. at 753, 104 S. Ct. 2091; *see also United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005).

In his answer to Plaintiff's interrogatories Feltner states
that he was inside Hurricane City limits when he received the
radio call regarding the incident at the courthouse.  (Feltner
Interrogs. ¶ k.)  The call indicated that the suspect was
probably heading out of town toward the town of Apple Valley.
(Feltner Interrogs. ¶ k.)  Feltner states that he immediately
turned on his overhead lights and began heading in that
direction. (Feltner Interrogs. ¶ a.)  Feltner first saw
Plaintiff's truck outside the city limits about one mile from the
city boundary.  (Feltner Interrogs. ¶ g.)

The video recordings taken from the officers' vehicles also
support this account.  (Pl.'s Mot. Summ. J. Ex. B.)  The
recording from officer Buell's car shows that he responded to the
courthouse at 15:43:15, just seconds after Plaintiff's
departure.[10]  Within two minutes of his arrival Buell radioed a
description of Plaintiff's vehicle stating that it was likely
headed toward Apple Valley.  The recording from Feltner's car
shows that he already had Plaintiff's vehicle in sight and was
pursuing with his overhead lights on at 15:47:42.  Plaintiff was
stopped at 15:48:20.  Thus, assuming the clocks in Buell and

---

[10] The recording from Buell's car includes a conversation
between Buell and Carr concerning the timing of the call to
police and Buell's response time.  During the conversation Buell
states that he probably passed Plaintiff on his way to the
courthouse.

Feltners' vehicles were synchronized, less than three minutes elapsed between the report of Plaintiff's likely direction and when Feltner had Plaintiff's vehicle in sight.  This timeline strongly refutes Plaintiff's allegation that Feltner "was broadly searching out in the country [for Plaintiff] and exceeded his jurisdiction."  (Pl.'s Aff. Supp. Mot. Summ. J. at ¶ f.)

Plaintiff argues that Feltner was not in hot pursuit because he did not have Plaintiff's vehicle in sight at the time he left his jurisdiction.  Plaintiff does not cite any legal authority as support for this interpretation of "hot pursuit."  Although there does not appear to be any controlling precedent on the issue in this jurisdiction other courts faced with this question have expressly rejected Plaintiff's position.  *See* *State v. Green*, 901 P.2d 1350, *1356 –1357 (Kan. 1995) ("actual visual pursuit of the person sought need not begin within the officer's territorial jurisdiction"); *Charnes v. Arnold*, 198 Colo. 362, 600 P.2d 64 (1979) (upholding as "fresh pursuit" extraterritorial warrantless arrest where suspect was not followed across jurisdictional boundary because police responded immediately to call and promptly pursued the only lead available).

Both the video recordings and Feltner's answers to interrogatories show that the pursuit of Plaintiff was immediate and continuous.  Plaintiff has not presented any evidence which creates a genuine issue of material fact on this issue.  Thus,

the Court concludes that the pursuit of Plaintiff beyond city limits fell within the fresh pursuit exception and was not unreasonable under the Fourth Amendment; therefore, Feltner and Lockwood are entitled to summary judgment on this claim.

### ii. Right to Counsel

Plaintiff argues that Feltner and Lockwood violated Plaintiff's right to counsel by questioning him about the courthouse incident while he was being detained and then arresting Plaintiff based on his refusal to speak.  The Court finds no merit to this claim.  First, the video recording of the incident shows that Plaintiff was not under arrest when the officers were questioning him.  Second, the record does not support the conclusion that Plaintiff was arrested because of his refusal to speak without counsel present.  Instead, it is clear that Plaintiff was arrested based on the oral order from Judge Carr which was transmitted to the officers by radio.  Plaintiff's refusal to speak to the officer had no bearing on the outcome of the stop.  Thus, the Court concludes that Feltner and Lockwood are entitled to summary judgment on this claim.

### E. Defendant Edwards: Prosecutorial Immunity

Defendant Edwards moves for summary judgment on the basis of prosecutorial immunity.  A prosecutor acting within the scope of his duties enjoys absolute immunity from suit under § 1983. *Imbler v. Pachtman*, 424 U.S. 409, 424, 96 S. Ct. 984, 992 (1976).

Absolute immunity does not extend to actions that are primarily investigative or administrative in nature, unless those acts are "necessary for the prosecutor to fulfill his function as an officer of the court." *Pfeiffer v. Hartford Fire Ins., 929 F.2d 1484, 1490 (10th Cir. 1991)*. Acts outside the scope of the prosecutor's role as advocate for the government, are entitled only to qualified "good faith" immunity. *Rex v. Teeples, 753 F.2d 840, 843 (10th Cir. 1985)*.

Plaintiff argues that Edwards is not entitled to immunity because his alleged actions were not prosecutorial in nature. Specifically, Plaintiff argues that Edwards exceeded his prosecutorial authority by attempting to act as Plaintiff's defense attorney during the contempt proceedings. The record before the Court, however, does not support this argument. While the record shows that Edwards attempted to talk to Plaintiff at Carr's direction it does not appear that Edwards was assuming the role of defense counsel. City prosecutors routinely approach unrepresented defendants in misdemeanor cases to discuss plea bargains or other matters. Edwards did not violate Plaintiff's rights merely by approaching Plaintiff to determine whether he wanted to discuss the charges against him. This is especially true given the fact that Plaintiff refused to speak to Edwards.

Although the Court is troubled by Edwards' alleged statement to Carr that Plaintiff "wanted to go to jail" it does not appear

that this statement had any bearing on the outcome of the proceedings.  The record shows that after Edwards reported that Plaintiff would not speak to him Carr returned to the bench and again offered Plaintiff an opportunity to explain his actions but Plaintiff refused.  Thus, it does not appear that Carr relied on Edwards' mischaracterization of Plaintiff's refusal to speak, nor is there any indication that Plaintiff's refusal influenced Carr's sentencing decision.  Finally, although Edwards stayed in the courtroom for the remainder of the proceeding it does not appear that he participated in any way.  Thus, the Court finds that Edwards is entitled to prosecutorial immunity for his involvement in the contempt proceeding.

Edwards is also immune from any claims stemming from the filing of the criminal information charging Plaintiff with disorderly conduct.  There is no question that the filing and subsequent dismissal of that charge involved prosecutorial functions for which Edwards is entitled to immunity.

Thus, the Court concludes that Edwards is entitled to summary judgment on Plaintiff's claims.

### F. Remaining Municipal Defendants: *Respondeat Superior*

#### i. Hirschi, Fawcett and Excell

Plaintiff's Amended Complaint asserts claims against Tom Hirschi, Clark Fawcett, and Lynn Excell individually, and in their respective official capacities as Hurricane City Mayor,

City Manager and Police Chief.  Plaintiff asserts that these officials are liable based on their failure to train and supervise their subordinates.  Plaintiff does not allege any direct involvement by any of these officials in Plaintiff's arrest or commitment to jail.

It is well settled that liability for a civil rights violation cannot be based on *respondeat superior*.  *See West v. Atkins*, 487 U.S. 42, 54 n.12, 108 S. Ct. 2250, 2258 n.12 (1988); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). Instead, "[p]ersonal participation is an essential allegation in a § 1983 claim." *Id.*  To establish a cognizable claim under § 1983 against a supervisor, a plaintiff must establish "that an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1187 (10th Cir. 2001).  "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).

Although Plaintiff asserts a general connection between the actions of the supervisory defendants and their subordinates he has not identified any specific acts that would affirmatively

link Hirschi, Fawcett or Excell to any constitutional violation.
The Court finds that the asserted connection between these
supervisory officials and the alleged constitutional violations
is too tenuous to support a claim under § 1983.  Thus, Hirschi,
Fawcett and Excell are entitled to summary judgment.

### ii. Municipal Liability

Plaintiff alleges that Hurricane City is liable based on its
hiring, supervision and training of city officials, including
Carr.  Plaintiff also alleges that LaVerkin City, Virgin
Township, Rockville Township, and Springdale Township are all
liable based on their contract for use of the Hurricane City
Justice Court.

Municipal entities cannot be held liable under § 1983 based
on the doctrine of *respondeat superior*.  *See Cannon v. City and
County of Denver*, 998 F.2d 867, 877 (10th Cir. 1993); *see also
Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694, 98 S.
Ct. 2018, 2051 (1978)*.  Instead, to establish municipal
liability, "a plaintiff must show (1) the existence of a
municipal custom or policy and (2) a direct causal link between
the custom or policy and the violation alleged." *Jenkins v.
Wood*, 81 F.3d 988, 993-94 (10th Cir. 1996) (citing *City of Canton
v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1205 (1989)).

Plaintiff has not established a direct causal link between
his alleged injuries and any municipal custom or policy.  The

only custom or policy cited by Plaintiff is the practice of
"acting on judge Carr's verbal order."  (Pl.'s Mot. Summ. J. at ¶
45.)  If this practice were held to satisfy the "custom or
policy" requirement Hurricane City would effectively be exposed
to liability any time a city official acted on the verbal
instructions of a justice court judge, regardless of whether the
judge's orders conformed with municipal policies.   Moreover,
although Plaintiff generally alleges failure to adequately train
and supervise, there is no evidence that defective training or
supervision directly caused Plaintiff's alleged injuries.  Thus,
the Court concludes that Plaintiff has failed to show any
municipal policy or custom that would subject Hurricane City to
liability.  Plaintiff has also failed to offer any support for
his contention that the contract between Hurricane City and
neighboring municipalities for use of the Hurricane City Justice
Court caused any constitutional violation.

Accordingly, Hurricane City, LaVerkin City, Virgin Township,
Rockville Township, and Springdale Township are entitled to
summary judgment on Plaintiff's claims.

### G. County Defendants

Plaintiff's Amended Complaint names Washington County
Sheriff Kirk Smith and Washington County as defendants based on
their operation of the Washington County Jail.  Plaintiff alleges
that Smith violated Plaintiff's rights by failing to properly

supervise and administer the jail and its staff thereby causing Plaintiff to be wrongfully incarcerated.  Plaintiff also alleges that jail officials subjected him to cruel and unusual punishment by failing to provide him adequate medical care during his incarceration.

Plaintiff has also filed a motion to join four additional Washington County defendants whose identities were ascertained through discovery, these include: Mary Reep, Chief Deputy County Sheriff; Perry Lambert, Chief Deputy County Sheriff; James Hanson, a jail medical officer; and Ray Kounalis, a jail officer. Based on the following analysis, however, the Court denies Plaintiff's motion for joinder.

### i. False Imprisonment

Plaintiff asserts that each of the Washington County Defendants are liable for Plaintiff's allegedly wrongful incarceration because they failed to adequately ensure the legality of Plaintiff's sentence before carrying it out.  As previously discussed, officials charged with executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order. *Valdez v. City and County of Denver*, 78 F.2d 1285, 1286 (10th Cir. 1989).

Plaintiff argues that the commitment order here was not "facially valid," and therefore does not entitle jail officials

to immunity, because it did not strictly comply with Utah Code § 78-32-3 which requires that in direct contempt cases "an order must be made, reciting the facts as occurring in [the judge's] immediate view and presence . . . ." *See* Utah Code Ann. § 78-32-3 (West 2007). Plaintiff asserts that based on this statute jail officials should have known that the commitment order was not facially valid because it did not include a recitation of the facts supporting the contempt holding.

Plaintiff was incarcerated pursuant to a commitment order prepared by Judge Carr which was accompanied by a probable cause statement prepared by Officer Morris. Although the commitment order does not recite the specific facts supporting the contempt finding it does identify the nature of the charge as "contempt of court." (Washington County Defs.' Mem. Supp. Mot. Summ. J. Ex. E at 10.) The probable cause statement also reflects that Plaintiff was "picked up" at the Hurricane City Justice Court for "contempt of court." (Washington County Defs.' Mem. Supp. Mot. Summ. J. Ex. E at 2.) Judge Carr also prepared an affidavit reciting the specific facts supporting his contempt holding, however, it was not signed until the day after the commitment and it was not included with the commitment order itself.[11]

---

[11] Although the Court was unable to find a copy of this affidavit in the record there does not appear to be any dispute regarding its date or contents.

In *State v. Williams*, 147 P.3d 497 (Utah App. 2006) the Utah
Court of Appeals elaborated on Utah Code § 78-32-3's fact-
findings requirement by stating:

> One who is to be punished for direct contempt is entitled
> to an order setting out "the facts as occurring in [the
> trial court's] immediate view and presence" that justify
> the contempt. We do not read section 78-32-3 as
> contemplating that those factual findings may be made
> months or years after the event, relying on a court's
> recollection rather than its present observation. Thus,
> *we determine that the factual grounds for a direct
> contempt citation must either be set out in
> contemporaneous fact findings or apparent on the record*,
> and that a citation that is unsupported by either of
> these bases must be vacated without a remand for post hoc
> justification by the trial court.

*Id.* at 504 (internal citations omitted)(emphasis added).

Despite being signed the day after the contempt proceeding
Carr's affidavit satisfies the contemporaneous fact-findings
requirement.  While the record does not contain any specifics
regarding the preparation or timing of Carr's affidavit there can
be little doubt that the justification for the contempt holding
remained fresh in Carr's mind just one day following the events.
Moreover, Plaintiff has not produced any evidence showing that
Carr's affidavit relied on vague recollection rather than present
observation.  Thus, the Court concludes that Carr's affidavit
satisfies the "contemporaneous fact findings" requirement under
Utah Code § 78-32-3, as explained in *Williams*.

The Court now turns to the question whether the commitment
order here was facially valid without Carr's affidavit being

attached.  It is apparent from *Williams* that the purpose for the fact-findings requirement under Utah Code § 78-32-3 is to ensure a reliable record for subsequent judicial review.  *Id.*; *see also State v. Barlow*, 771 P.2d 662, 664 (Utah App. 1989) (reversing contempt finding because appellate review was impossible without fact findings).  There is no support for Plaintiff's contention that the fact findings were intended to aid jailors in independently evaluating the legality of a related commitment order.  Nor is there any support for Plaintiff's argument that "at the very least booking officers should be accustomed to seeing a recitation of the facts as occurring as part of the [commitment] order or attached thereto!"  Such a requirement would serve no legitimate purpose because jail officials are not equipped to independently evaluate the legal sufficiency of fact-findings.  Requiring them to do so would effectively turn them into "pseudo-appellate courts scrutinizing the orders of judges."[12]  *Valdez*, at 1289.

Thus, the Court finds that the lack of fact findings accompanying the commitment order here did not make the order

---

[12] Even if the Court adopted Plaintiff's position that a commitment order is invalid under Utah law unless accompanied by fact findings, Defendants would still be entitled to qualified immunity unless Plaintiff could show that the law on this point was clearly established at the time of his incarceration.  Based on a review of the relevant caselaw, however, it is highly unlikely that Plaintiff could make such a showing.

invalid on its face, therefore, jail officials are entitled to quasi-judicial immunity against Plaintiff's claim of false imprisonment.

### ii. Cruel and Unusual Punishment

Plaintiff claims that he was subjected to cruel unusual punishment during his incarceration in violation of the Eighth Amendment.  In support of this claim Plaintiff's Amended Complaint states: "Plaintiff was incarcerated for five days, placed in lockdown, placed in a cell with a state inmate with known dangerous propensities, denied proper medical care, denied a medically necessary diet and there suffered pain and anguish for the length of incarceration and for a substantial period of time after release."  (Am. Compl. at ¶ 74.)

### a. Failure to Protect

To state a claim under the Eighth Amendment based on failure to protect, an inmate must allege facts showing: first, that he is incarcerated under conditions posing a substantial risk of serious harm; and, second, that the prison official "'has a sufficiently culpable state of mind,'" i.e., that he or she is deliberately indifferent to the inmate's health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  A prison official's state of mind must be  measured by a subjective standard.  *Id. at 835*. Thus, the official must "both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference." *Id.* A defendant
is deliberately indifferent if he "knows of and disregards an
excessive risk to inmate health and safety." Farmer, 511 U.S. at
837. The deliberate indifference standard is not satisfied by
either negligence or constructive notice. *See Id.* at 835, 841.

Plaintiff's bare allegation that he was "placed in a cell
with a state inmate with known dangerous propensities" is
insufficient to state a viable claim under the Eighth Amendment.
Plaintiff has not produced any evidence showing that he faced a
substantial risk of serious harm from his cellmate. Merely being
housed with a cellmate who has "dangerous propensities" does not
equate to being placed in substantial danger. More importantly,
there is no evidence that Defendants were subjectively aware that
Plaintiff faced any danger. Plaintiff does not allege that he
told jail officials that he was in danger of being attacked by
his cellmate, nor does Plaintiff allege that he was actually
attacked or injured by his cellmate. Thus, the Court concludes
that Defendants are entitled to summary judgment on Plaintiff's
failure to protect claim.

### b. Denial of Medical Care

Plaintiff alleges that jail officials failed to provide him
adequate medical care in violation of the Eighth Amendment.
Plaintiff states that when he was booked into the jail he told

the deputies that he suffered from "a variety of physical ailments, including pancreatitis, which require treatment and when untreated cause physical pain and injury."  (Am. Compl. at ¶ 49.)  Plaintiff further alleges that "while incarcerated, [he] made numerous requests of the sheriff's deputies for medical assistance for his untreated and painful physical ailments" and that Plaintiff's wife also contacted Fawcett and Hirschi "on repeated occasions" to advise them about Plaintiff's "serious and painful medical conditions."  (Am. Compl. at ¶ 51.)

In *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (quoting *Greg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976)).  "Deliberate indifference involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).  The subjective component is met

only if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Allegations of mere negligence in diagnosing or treating a medical condition, *Estelle*, 429 U.S. at 105, or "inadvertent failure to provide adequate medical care," *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996), are insufficient to state a claim under the Eighth Amendment.

Plaintiff has not shown that his medical needs were sufficiently serious to state a claim under the Eighth Amendment. The only evidence presented regarding Plaintiff's medical needs is an affidavit from Plaintiff's wife, Ruth Andrus, stating that Plaintiff suffers from "several painful and potentially serious health problems" including "hypertension, pancreatitis, arthritis and bowel problems." (Pla.'s Aff. Supp. Mot. Summ. J. Ex. D.) None of these conditions are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," nor is there any evidence that they were "diagnosed by a physician as mandating treatment."

There is also no evidence that jail officials were deliberately indifferent to Plaintiff's medical needs.  The record shows that Plaintiff never formally requested medical care while at the jail.  While Plaintiff argues that jail staff should have been more proactive in ascertaining Plaintiff's needs and treating him there is no evidence that Plaintiff was unable to

request treatment on his own.  Moreover, after receiving word that Plaintiff's wife had voiced concerns about Plaintiff's health the jail nurse, James Hanson, visited Plaintiff to determine whether he needed treatment.  According to Hanson Plaintiff denied needing any prescription medication and stated that he would be able to get adequate remedies, such as antacids, from the "med cart."  Although Plaintiff denies making this statement the unsolicited visit from medical staff strongly refutes Plaintiff's assertion that Defendants were deliberately indifferent to Plaintiff's medical needs.

Thus, the Court concludes that the evidence does not support an Eighth Amendment claim for failure to provide medical care and Defendants are entitled to summary judgment on this claim.

## IV. State Law Claims

Under 28 U.S.C. § 1367(c)(3) a district court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction.  *See* 28 U.S.C.A. § 1937(c)(3) (West 2007).  Having concluded that Defendants are entitled to summary judgment on all claims arising under federal law the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and hereby dismisses them without prejudice.

**ORDER**

Based on the foregoing, **IT IS HEREBY ORDERED** that:

(1) Defendants' motions for summary judgment are **GRANTED;**

(2) Plaintiff's motion for summary judgment is **DENIED;**

(3) Plaintiff's motion for joinder is **DENIED;** and,

(4) Plaintiff's pendent state law claims are dismissed without prejudice.

DATED this 15th day of February, 2008.

BY THE COURT:

_____
Dale A. Kimball
United States District Judge